UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JESSICA ROSEANNA VECCHIO,

                        Plaintiff,

      -v-

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

CIVIL ACTION NO.: 20 Civ. 8105 (MKV) (SLC)

**REPORT AND RECOMMENDATION**

**SARAH L. CAVE**, United States Magistrate Judge.

**TO THE HONORABLE MARY KAY VYSKOCIL**, United States District Judge:

## I.      INTRODUCTION

Plaintiff Jessica Roseanna Vecchio ("Ms. Vecchio") commenced this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g). Ms. Vecchio seeks review of the decision by the Commissioner (the "Commissioner") of the Social Security Administration ("SSA"), denying her application for Disability Insurance Benefits ("DIB") under the Act. Ms. Vecchio contends that the decision of the Administrative Law Judge ("ALJ") dated August 27, 2019 (the "ALJ Decision") was erroneous, not supported by substantial evidence, and contrary to law, and asks the Court to reverse the Commissioner's finding that she was not disabled and remand to the Commissioner for a new hearing.

The parties have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). On June 15, 2021, Ms. Vecchio filed a motion for judgment on the pleadings (ECF No. 17 ("Ms. Vecchio's Motion"), on November 1, 2021, the Commissioner cross-moved (ECF No. 23 (the "Commissioner's Motion")), and on November 22, 2021, Ms. Vecchio filed a

reply memorandum of law in further support of her Motion.  (ECF No. 25).  For the reasons set forth below, I respectfully recommend that Ms. Vecchio's Motion be DENIED and the Commissioner's Motion be GRANTED.

## II.   **BACKGROUND**

### A.  **Procedural Background**

On August 25, 2017, Ms. Vecchio filed an application for DIB,[1] alleging a disability onset date of April 15, 2017 based on psychiatric disorders including depression, anxiety, panic disorder and post-traumatic stress disorder ("PTSD").  (Administrative Record ("R.") 62, 159 (ECF Nos. 16 – 16-1)).  On December 4, 2017, the SSA denied Ms. Vecchio's application (R. 79–82).  After Ms. Vecchio requested a hearing before an ALJ, on May 22, 2019, ALJ Laura Michalec Olszewski conducted a hearing in White Plains, New York (the "Hearing").  (R. 11–44).  On August 27, 2019, ALJ Olszewski issued her Decision finding that Ms. Vecchio was not disabled under the Act. (R. 62–74).  The ALJ Decision became the final decision of the Commissioner when the Appeals Council denied review on July 29, 2020.  (R. 1–5).

### B.  **Factual Background**

#### 1.  **Non-medical evidence**

Ms. Vecchio was born in 1992 and was 25 years old when she filed her DIB application. (R. 165).  She was married and lived in a condo with her husband, her mother, her mother's boyfriend, her sister, and five pets.  (R. 19–20, 261).  Ms. Vecchio was responsible for walking the dog and cleaning up after the cats.  (R. 25).   Ms. Vecchio does not have children.  (R. 19).

---

[1] In order to quality for DIB, one must be both disabled and insured for benefits.  42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.120, 404.315(a).  The last date a person meets the insurance requirement is the date by which the claimant must establish a disability.

Ms. Vecchio attended four years of high school, from September 2006 through June 2010, and in April 2014 received an Associates' Degree after completing two years of college.  (R. 19, 160).  From November 2015 through April 2017 she worked two part-time retail jobs, for a total of 32 hours weekly.  (R. 22–23, 160).  Until February 2018, within her alleged disability period, Ms. Vecchio worked in retail as a cashier, sales floor associate, and assisting with inventory.  (R. 22–23; see R. 153, 159).

Ms. Vecchio does not have a driver's license, although she has a permit; she relies on either her husband or mother for transportation.  (R. 21).  She has not used public transportation since approximately 2015.  (Id.)

### 2.  Medical evidence

Ms. Vecchio's Motion focuses on the ALJ's evaluation of her psychiatric impairments and does not challenge the ALJ's determination that she was capable of medium level physical exertion.  (See ECF Nos. 18, 25).  Accordingly, the Court summarizes below the medical evidence concerning her psychiatric impairments.

#### a.  Psychiatric care at Carmel Psych Associates

Beginning November 16, 2016, Ms. Vecchio received regular psychiatric treatment at Carmel Psych Associates, under the care of Sybil Mouzon, M.D., and beginning on April 27, 2017, from Cecilia Rembert, Psy.D.  (R. 381).

##### i.  Cecilia Rembert, Psy.D.

The Record includes approximately two dozen progress notes by Dr. Rembert summarizing the course of Ms. Vecchio's therapy between April 2017 and April 2019 (the "Progress Notes"), as well as an April 27, 2017 evaluation and April 3, 2019 Psychiatric Functional

Assessment (the "Functional Assessment").  (R. 261–66, 381–88, 391–464).  Some Progress Notes described high levels of anxiety, depression, and psychiatric symptomology, while others described Ms. Vecchio's psychiatric health as controlled.  (See id.)  The Court summarizes below several representative progress reports from each category.  See, e.g., Acosta Cuevas v. Comm'r of Soc. Sec., No. 20 Civ. 502 (AJN) (KHP), 2021 WL 363682, at *3 (S.D.N.Y. Jan. 29, 2021) (summarizing a course of therapy sessions and noting fairly consistent records with occasional outliers of increased psychiatric symptomology).

On April 27, 2017, Dr. Rembert evaluated Ms. Vecchio.  (R. 261–66).  Dr. Rembert's evaluation noted that Ms. Vecchio was working in retail part time and that her anxiety, which had begun approximately six years earlier, manifested in panic attacks and difficulty catching her breath. (R. 261).  Dr. Rembert noted that Ms. Vecchio had a history of self-harm, including cutting herself, since age fourteen.  (Id.)  Ms. Vecchio was prescribed Zoloft, Valium, and Remeron at this time.  (Id.)  Dr. Rembert performed a mental status examination, which documented a normal appearance and thought process, congruent and sad mood, average intellect, and sleep aided with Remeron.  (R. 262).  There was no reported history of conduct problems, Ms. Vecchio's GAF score was 65, and Dr. Rembert diagnosed major depressive disorder, panic disorder, and personality disorder.  (R. 266).

On May 3, 2017, Ms. Vecchio said she was sad but "managing."  (R. 459).  She brought up past traumas including a sexual assault and described having flashbacks.  (Id.)

On July 26, 2017, Ms. Vecchio reported less anxiety after switching prescriptions from Valium to Xanex.  (R. 453).  On August 30, 2017, she reported experiencing increased anxiety "paired with tremors and shaking."  (R. 451).  She discussed being asked to work more as a

cashier, with which she was uncomfortable, and described only being able to "barely manage a [four-]hour shift without heightened agitation and anxiety." (Id.)

On September 24, 2017, Ms. Vecchio informed Dr. Rembert that she had a panic attack and could not breathe. (R. 447). Although she tried coping mechanisms including deep breathing, she ultimately sought treatment at a hospital. (Id.) The following day, she reported that she stayed at the hospital for several hours, was given hydroxyzine, and calmed down. (Id.)

Dr. Rembert's progress notes from December 14, 2017 note that Ms. Vecchio "appeared calmer," and she noted that she was able to work several days that week. (R. 435). Dr. Rembert focused her session on coping with the additional stress in the retail environment presented by the holidays. (Id.)

On March 14, 2018, Ms. Vecchio's mood was "fairly bright" and she reported less anxiety and fewer panic attacks, with none the preceding week. (R. 428). Ms. Vecchio was not working as a result of back pain, and she surmised that working was the source of her anxiety and panic. (Id.) Dr. Rembert addressed coping mechanisms to manage stressors. (Id.)

On August 22, 2018, Ms. Vecchio described her anxiety as "not that bad," and mentioned her husband's anxiety and not being able to work due to back pain. (R. 420). Therapy focused on how Ms. Vecchio and her husband were supporting one another. (Id.) Similarly, on September 5, 2018, Ms. Vecchio appeared calm and reported that she did not experience anxiety frequently, since she had not been working. (R. 419).

On October 31, 2018, Dr. Rembert noted that Ms. Vecchio's mood was "bright," but she reported being "really anxious" and having had symptoms of a panic attack several days ago,

although she was feeling "good."  (R. 414).  Ms. Vecchio expressed interest in working as a postal worker or other civil service job and stated she would pursue taking a civil service exam.  (Id.)

On March 28, 2019, Ms. Vecchio reported feeling stressed and overwhelmed, culminating in her cutting her leg.  (R. 397).

Dr. Rembert's April 3, 2019 Functional Assessment documented that Ms. Vecchio had a traumatic past, and experienced depressed mood and anxiety, manifesting in panic attacks, flashbacks, and nightmares.  (R. 381).  Her triggers included "leaving the home, changes in the routine/plans and reminders of her traumatic past."  (Id.)  Dr. Rembert stated her prognosis was fair with ongoing treatment.  (Id.)  The Functional Assessment noted marked or serious limitations in her ability to recognize a problem and correct it, cooperate and handle conflict with others, maintain attention for a two-hour segment, ignore or avoid distractions while working, manage psychologically-based symptoms, and respond appropriately to changes in a routine work setting.  (R. 382–84).  By contrast, the Functional Assessment noted only moderate or mild limitations to her ability to understand and remember short, simple instructions, identify and solve problems, remember work procedures and make work-related decisions, understand social cues, get along with coworkers, complete tasks in a timely manner, perform a consistent pace without interruption from symptoms,  respond to demands, and deal with work stress.  (Id.)

The Functional Assessment stated that Ms. Vecchio had a "serious and persistent" mental disorder lasting at least two years, and answered in the affirmative the question "Is there ongoing medical treatment, medication, mental health therapy, psychosocial support, or a highly-structured setting that diminishes signs or symptoms?"  (R. 387).  The Functional Assessment

stated that changes in environment and increased mental demands would both cause anxiety. (Id.)

### ii.    Sybil Mouzon, M.D.

The Record includes notes of medical treatment provided by Dr. Mouzon between 2016 and 2019, which include instances of both controlled and more pronounced psychiatric symptoms.  The Court summarizes below several representative records.  At her initial visit on November 16, 2016, Ms. Vecchio stated that she was seeking treatment for worsening anxiety and an "up and down" mood.  (R. 270–72).  Dr. Mouzon performed a mental status examination and noted that her affect was congruent with her mood, her judgment, insight and impulse control were good, she was alert, and she made good eye contact.  (R. 272).  Dr. Mouzon diagnosed panic disorder, major depression and personality disorder, continued her Zoloft prescription at an increased dose of 150 milligrams daily, and continued her Xanex.  (R. 273).

On April 20, 2017, Ms. Vecchio said she was "ok" and reported improvement in her anxiety.  (R. 282).  Dr. Mouzon's mental status examination documented that her mood was euthymic, her thought content was unremarkable, she had good judgment and insight, intact cognition, and mildly impaired impulse control, and she was well groomed and made good eye contact.  (Id.)  Dr. Mouzon continued the current regimen of medications but planned a gradual taper of her Valium dose.  (Id.)

On August 9, 2017, Ms. Vecchio reported that her mood was "all over the place" and a mental status examination documented a "full range" affect, and preoccupations of thought, with good judgment, insight, impulse control, intact cognition, and no abnormalities of perception.  (R. 276).  Dr. Mouzon continued to taper her Zoloft and increased her Effexor dosage.

(Id.)  Similarly, on September 11, 2017, Ms. Vecchio described a worsening, anxious mood, noted that she filed for disability, and Dr. Mouzon's mental status examination listed a constricted affect, preoccupations of thought, no abnormalities in perception, good judgment, insight and impulse control, intact cognition, and a well-groomed appearance.  (R. 275).   Dr. Mouzon increased her Mirtazapine dose and changed the timing of her Effexor dose.  (Id.)

On January 10, 2018, Ms. Vecchio reported her depression and anxiety were unchanged, and described having trouble at work with functioning, but Dr. Mouzon noted that she appeared calmer and less distressed.  (R. 348).  A mental status examination documented a euthymic affect, goal-directed thought process with preoccupations of thought, and no abnormalities in perception, as well as good insight, judgment, impulse control, and intact cognition.  (Id.)  Dr. Mouzon increased her prescription for Abilify, continued her Effexor dose, and modified her Xanex dosage.  (Id.)

A mental status examination on June 5, 2018 documented a euthymic affect, normal speech, goal directed thought process, no abnormalities in perception, preoccupations in thought, and good judgment, insight, impulse control and cognition despite her mood being "a bit anxious."  (R. 341).

On October 25, 2018, Ms. Vecchio reported that she "was down, but getting better." (R. 335).  After a weekend in which she did not leave her home, Ms. Vecchio acknowledged that she was starting to feel more like herself, was beginning to feel a little better, was going out more often, and did not experience panic attacks.  (Id.)  Dr. Mouzon noted that she was able to use coping strategies after a brief period of increased depressive symptoms.  (Id.)  The mental status evaluation documented a constricted affect, normal speech, goal directed thought process

without abnormalities in thought content or perception, and good judgment, insight and impulse control as well as intact cognition.  (Id.)

In a progress note from March 27, 2019, Ms. Vecchio reported feeling "up and down," although a mental status examination was unremarkable, with a euthymic affect, preoccupations of thought, no perception abnormalities, and good judgment, insight, impulse control and cognition.  (R. 329).

In a letter dated March 28, 2019, Dr. Mouzon noted that Ms. Vecchio's active prescriptions included Xanex XR (3 milligrams daily), Effexor XR (150 milligrams daily), Gabapentin (600 milligrams, three times daily), hydroxyzine (25 milligrams twice daily as needed), and Lamictal (25 milligrams daily, to be increased to 50 milligrams daily).  (R. 389).

### b.  Emergency room visits

The Record includes documents from several emergency department visits, and the Court summarizes those that involved psychiatric issues only.

On September 27, 2017, Ms. Vecchio presented to the Hudson Valley Hospital emergency department complaining of shortness of breath for the past four days and feeling increased anxiety after a dispute with her boyfriend.  (R. 479).  The Record notes that she had gone to the emergency room at another hospital two days earlier for an acute panic attack, after which she was prescribed Atarax.  (Id.)  Ms. Vecchio was deemed stable, diagnosed with anxiety, and directed to follow-up with her psychiatrist promptly.  (R. 485).

On November 19, 2017, Ms. Vecchio again presented to the Hudson Valley Hospital emergency department with difficulty breathing and anxiety following a dispute with her fiancé and a friend.  (R. 486).  Ms. Vecchio was treated with Ativan, diagnosed with acute anxiety, and

discharged in stable condition with instructions to follow up with her primary care physician. (R. 487–88).

### c.  <u>Psychiatric evaluation by Melissa Antiaris, Psy.D.</u>

On November 13, 2017, Melissa Antiaris, Psy.D., provided an independent psychiatric evaluation of Ms. Vecchio.  (R. 296–300).  Ms. Vecchio reported "very bad" anxiety, worsening depression over the last two years, daily panic attacks, flashbacks, hyperstartle response, and nightmares.  (R. 296–97).  She shared that she suffered from post-traumatic stress as a result of sexual assault.  (R. 297).  Ms. Vecchio reported overcoming a history of drug and alcohol abuse, as well as substance abuse and mental health issues in her family.  (<u>Id.</u>)

Ms. Vecchio reported working 16 hours per week as a sales associate but experienced difficulties that she attributed to anxiety and panic.  (R. 296).  She stated that she was "social on occasion," and during the day either worked or watched television, although she was able shop and assist at home.  (R. 298–99).  Ms. Vecchio also stated that she received psychiatric treatment every two to three weeks, psychological counseling twice weekly, and was prescribed Xanex, Risperdal, Effexor, and Hydroxyzine.  (R. 296).

Dr. Antiaris performed a mental status examination and documented that Ms. Vecchio's mood was euthymic, although she reported feeling anxious; her thought processes were coherent and goal directed; her affect was appropriate and of the full range; attention and concentration were mildly impaired due to limited intellectual functioning; cognitive functioning was below average and her judgment was poor.  (R. 297–98).

Dr. Antiaris diagnosed Ms. Vecchio with moderate, recurrent major depressive disorder, generalized anxiety disorder, PTSD (by report), panic disorder, and substance abuse, in either

early or full sustained remission.  (R. 299).  Dr. Antiaris opined that her "[d]ifficulties are caused

by lack of motivation" and described the following limitations:

> <u>No limitation</u>: ability to understand, remember, and apply simple directions and
> instructions; be aware of normal hazards or take appropriate precautions.
> <u>Mild limitation</u>: ability to understand, remember, and apply complex directions and
> instructions; sustain concentration, maintain pace, and sustain an ordinary routine and
> attendance; maintain personal hygiene and appropriate attire.
> <u>Moderate limitation</u>: ability to use reason and judgment to make work-related decisions
> and interact adequately with supervisors, coworkers, and the public.
> <u>Marked limitation</u>: ability to regulation emotions, control behavior, and maintain well-
> being.

(R. 299).  Dr. Antiaris rendered a "guarded" prognosis and suggested that therapy continue for at

least one year.  (R. 300).

### d.  Opinion by L. Hoffman, Ph.D.

SSA psychological consultant L. Hoffman, Ph.D. reviewed Ms. Vecchio's medical records

and concluded that she was able to understand and remember work procedures and instructions,

complete simple tasks on a consistent basis, interact in a socially appropriate manner to meet

work related needs and cope with basic changes and make routine decisions.  (R. 55–56; <u>see</u>

R. 71).

### C.  Administrative Proceedings

### 1.  The Hearing

### a.  Testimony by Ms. Vecchio and Laura Vecchio

At the start of the Hearing, the ALJ advised Ms. Vecchio of her right to hearing

representation and found that she waived that right.  (R. 13–16).   Ms. Vecchio described her

activities in a typical day, including running errands with her mother to avoid being "in the house

all day," visiting malls with her husband, attending church weekly, and assisting with tasks around

her home, including cleaning her husband's laundry. (R. 23–26). Ms. Vecchio went out "different places" for enjoyment, and ate out at restaurants every week or two. (R. 30–31). Ms. Vecchio used the internet for email, social media, and for reselling items on eBay. (R. 26–28). She described being unable to go out alone or she will "panic and freak out." (R. 26).

Ms. Vecchio testified that she was currently on medications, which were "somewhat" helpful because they prevented her from being "ten times worse." (R. 28–29). She described having good days and bad days. (R. 29). She testified that she constantly suffered from nightmares concerning her former co-workers and she felt that she could not "trust people or anything anymore." (R. 31–32).

Ms. Vecchio brought up that she had a workers' compensation case, which she speculated was dismissed after she was deemed "okay to go back to work." (R. 33–34). Ms. Vecchio testified that as a result of her anxiety she "just couldn't deal with it." (R. 34).

Ms. Vecchio's mother, Laura Vecchio, briefly testified at the Hearing. (R. 34–36). She testified that Ms. Vecchio's "mental capacity has gone down quite a bit[,]" and noted that there was a history of mental illness within the family. (R. 35). Laura Vecchio elaborated that Ms. Vecchio "doesn't want to go out[,]" and had significant anxiety, depression and panic disorders. (Id.) Ms. Vecchio declined to ask any follow-up questions of her mother. (Id.)

### b. **Vocational expert testimony**

Vocational expert ("VE") Edward Hopkins testified at the conclusion of the hearing. (R. 36–43). VE Hopkins classified Ms. Vecchio's past work as a "sales attendant," at the light exertion level. (R. 38).

The ALJ posed several hypotheticals to the VE.  First, the ALJ posed a hypothetical individual of Ms. Vecchio's age and education level who could work at the medium exertion level, lifting and carrying 50 pounds occasionally and 25 pounds frequently, sitting, standing or walking for six hours in a workday, and limited to simple and routine tasks and occasional interactions with others ("Hypothetical One").  (R. 38).  The VE testified that this hypothetical individual would be incapable of performing Ms. Vecchio's past work, but could work as an industrial cleaner or sweeper, or as a hospital cleaner.  (R. 39–40).

The ALJ then posed a second hypothetical, identical to Hypothetical One, except at the light exertion level, limited to lifting or carrying 20 pounds occasionally and ten pounds frequently.  (R. 40).  The VE testified that this individual would also be incapable of performing Ms. Vecchio's past work, but could work as a marker, housekeeper, or sorter of agricultural produce.  (R. 40).  The VE testified that the individual would be limited to fifteen percent of time off-task and no unscheduled absences after the first 90 days of work.  (R. 41).

### 2.  The ALJ Decision and Appeals Council Review

On August 27, 2019, ALJ Olszewski issued her Decision finding Ms. Vecchio not disabled and denying her application for DIB benefits.  (R. 62–74).  The ALJ followed the five-step disability determination process.  20 C.F.R. § 404.1520(a)(4)(i)–(v).  As a preliminary matter, the ALJ determined that Ms. Vecchio met the insurance requirements through March 31, 2021.  (R. 64).  At step one, ALJ Olszewski determined that Ms. Vecchio had not engaged in substantial gainful employment since the onset date.  (R. 64–65).  At step two, the ALJ determined that she had nine severe impairments: (i) obesity; (ii) degenerative disc disease; (iii) anxiety; (iv) depression; (v)

personality disorder; (vi) PTSD; (vii) learning disability; (viii) alcohol use disorder; and (ix) substance abuse disorder.  (R. 65).

At step three, however, ALJ Olszewski determined that none of Ms. Vecchio's impairments were of a severity to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526 (the "Listings").  (R. 65).  In reaching that conclusion, the ALJ considered Listings 1.04 (disorder of the spine), 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders) and 12.15 (trauma- and stressor-related disorders).  (R. 65–67).

In evaluating Ms. Vecchio's psychiatric disorders, the ALJ determined that the "paragraph B" and "paragraph C" criteria for listings 12.04, 12.06, 12.08 and 12.15 were not met because she did not have at least two "marked" limitations or one "extreme" limitation and did not present with a "serious and persistent disorder" including only marginal adjustment despite ongoing persistent treatment.  (R. 66–67).  Instead, the ALJ found that Ms. Vecchio had only mild limitations in her ability to understand, remember or apply information; and moderate limitations in interacting with others, concentrating, persisting and maintaining pace, and adapting or managing herself.  (R. 66).  The ALJ based these findings on her observations of Ms. Vecchio's abilities to "complete many activities of daily living," get along well with others, regularly go into public for a range of activities, including socializing and running errands, assist with household chores, and follow instructions from healthcare providers.  (Id.)

Before moving to step four, the ALJ addressed Ms. Vecchio's RFC, and found that she had the RFC to "perform medium work . . . in a low-stress environment defined as occasional use of

judgment, occasional decision-making, and occasional changes in work setting[,]" with occasional interactions with supervisors, co-workers, and the public, and limited to performing simple and routine tasks.  (R. 67 ("Ms. Vecchio's RFC")).

In determining Ms. Vecchio's RFC, the ALJ considered all of her symptoms "and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence," and "the medical opinion(s) and prior administrative medical finding(s)" in accordance with SSA regulations.  (R. 67).  In evaluating the limitations stemming from her psychiatric impairments, the ALJ limited Ms. Vecchio to low-stress work, noting the record of mental status examinations and objective clinical findings, that "medication helps with her psychological symptoms, and her depression and anxiety [are] reasonably controlled with treatment[,]" as well as her subjective complaints.  (R. 68–70).

With respect to Ms. Vecchio's psychiatric impairments, the ALJ considered the medical opinions of SSA psychological consultant Dr. Hoffman, consultative examiner Dr. Antiaris, and treating physician Dr. Rembert.  (R. 70–72).  The ALJ found Dr. Hoffman's opinion that Ms. Vecchio had only mild or moderate psychological limitations affecting her ability to work persuasive, as supported by, and consistent with, Ms. Vecchio's daily activities and unremarkable mental status examinations.  (R. 71).  Likewise, the ALJ deemed Dr. Antiaris' opinion persuasive, except concerning marked limitations to the ability to regulate emotions, control behavior and maintain well-being, which the ALJ deemed inconsistent with the unremarkable mental status examinations.  (R. 71).

ALJ Olszewski deemed "not persuasive" Dr. Rembert's opinion concerning the extent of Ms. Vecchio's psychiatric impairments, finding that "such extreme limitations are not supported

by, or consistent with, the totality of the medical evidence of record and the unremarkable mental health treatment records, which show unremarkable mental status examinations[,]" and singled out in particular Dr. Rembert's own April 2017 assessment that Ms. Vecchio had a GAF score of 65, which the ALJ deemed "inconsistent with [Dr. Rembert's] opinion."  (R. 72).

With respect to Ms. Vecchio's credibility, the ALJ determined that Ms. Vecchio's statements concerning "the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (R. 70).  Among the reasons she provided, the ALJ noted that Ms. Vecchio's "allegations of disabling impairments are unsupported by her own statements and actions[,]" including socializing with friends, attending church, and "even work[ing] part-time as a sales associate after her alleged onset date of disability."  (R. 70).

Last, the ALJ deemed unpersuasive Laura Vecchio's testimony as "lack[ing] substantial support from objective findings in the record."  (R. 72).

At step four, the ALJ determined that Ms. Vecchio did not have the RFC to perform past relevant work as a sales attendant.  (R. 73).  At step five, the ALJ determined that based on Ms. Vecchio's age, education, work experience, and RFC, that jobs exist in significant numbers in the national economy that she could perform, as an industrial sweeper and hospital cleaner.  (R. 73–74).  For these reasons, the ALJ concluded that Ms. Vecchio was not disabled.  (R. 74).

On June 29, 2020, the Appeals Council denied Ms. Vecchio's request for review of the ALJ Decision.  (R. 1–5).

### III.    LEGAL STANDARDS

#### A.  Standard of Review

Under Rule 12(c), a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law.  See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."   42 U.S.C. § 405(g).   A court may set aside the Commissioner's decision denying SSI benefits if it is not supported by substantial evidence or was based on legal error.  See Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).   Judicial review, therefore, involves two levels of inquiry.   First, the Court must decide whether the ALJ applied the correct legal standard.   See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008). Second, the Court must decide whether the ALJ's decision was supported by substantial evidence.   Id.  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."   Longbardi v. Astrue, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).   Substantial evidence is "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted).   The substantial evidence test applies not only to the factual findings, but also to the inferences and conclusions drawn from those facts.   See, e.g., Carballo ex rel. Cortes v. Apfel, 34

F. Supp. 2d 208, 214 (S.D.N.Y. 1999).  In determining whether the administrative record contains evidence to support the denial of claims, the Court must consider the whole record, and weigh all evidence to ensure that the ALJ evaluated the claim fairly.  See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).  The Commissioner, not the Court, resolves evidentiary conflicts and appraises the credibility of witnesses, including the claimant.  See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Disability-benefits proceedings are non-adversarial in nature, and therefore, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel.  See Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009).  To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources.  20 C.F.R. § 404.1512(b).  Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity."  Casino-Ortiz v. Astrue, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007).  When there are inconsistencies, gaps, or ambiguities in the record, the regulations give the ALJ options to collect evidence to resolve these issues, including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others.  20 C.F.R. § 404.1520b.

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); see Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004).  If "there are gaps in the administrative record or the

ALJ has applied an improper legal standard," the Court will remand the case for further development of the evidence or for more specific findings. Rosa v. Callahan, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).  Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39.  If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate.  See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)).

### B.  Eligibility for Benefits

For purposes of DIB benefits, one is "disabled" within the meaning of the Act, and thus entitled to such benefits, when he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(3)(A).  The Act also requires that the impairment be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(3)(B).  In reviewing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to

by claimant and other witnesses; and (4) the claimant's background, age, and experience."

Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988).

Under the applicable regulations, an alleged disability is evaluated under the sequential five-step process set forth in 20 C.F.R. § 404.1520(a)(4)(i)–(v).  The Second Circuit has described the process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity.  If not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on the medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the Claimant could perform.

Bush v. Shalala, 94 F. 3d 40, 44–45 (2d Cir. 1996) (quoting Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983)).

At the first four steps, the claimant bears the burden of proof.  At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs in the national economy that the claimant can perform.  See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).  In meeting the burden of proof at the fifth step, the Commissioner can usually rely on the Medical-Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, known as "the Grid." Zorilla v. Chater, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996).

C.  **Evaluation of Medical Opinion Evidence**

For benefits applications filed before March 27, 2017, the SSA's regulations required an ALJ to give more weight to those physicians with the most significant relationship with the claimant.  See 20 C.F.R. § 404.1527; see also Taylor v. Barnhart, 117 F. App'x 139, 140 (2d Cir. 2004).  Under this "Treating Physician Rule," an ALJ was required to "give good reasons" (20 C.F.R. § 404.1527(c)(2)) if he or she determined that a treating physician's opinion was not entitled to "controlling weight," or, "at least greater weight" than the opinions of non-treating and non-examining sources.  Gonzalez v. Apfel, 113 F. Supp. 2d 580, 588–89 (S.D.N.Y. 2000); see Estrella v. Berryhill, 925 F.3d 90, 96 (2d Cir. 2019).  In addition, under the Treating Physician Rule, a consultative physician's opinion was generally entitled to "little weight."  Giddings v. Astrue, 333 F. App'x 649, 652 (2d Cir. 2009).

On January 18, 2017, the SSA published comprehensive revisions to the regulations regarding the evaluation of medical evidence, revisions that were applicable to applications filed on or after March 27, 2017.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01, 2017 WL 168819 (Jan. 18, 2017).  These new regulations reflect a departure from a perceived hierarchy of medical sources.  See id.  The regulations now provide that an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."[2]  20 C.F.R. § 404.1520c(a).  See Young v. Kijakazi, No. 20 Civ. 3604 (SDA), 2021 WL

---

[2] The new regulations define "prior administrative medical finding" as:

> [A] finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 404.900) in your current claim based on their review of the evidence in your case record, such as: (i) The existence and severity of your

4148733, at *9 (S.D.N.Y. Sept. 13, 2021).  Instead, an ALJ must consider all medical opinions in the record and "evaluate the persuasiveness" based on five "factors": (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) any "other" factor that "tend[s] to support or contradict a medical opinion."  20 C.F.R. § 404.1520c(a)–(c).

The ALJ's duty to articulate a rationale for each factor varies.  20 C.F.R. § 404.1520c(a)–(b).  Under the new regulations, the ALJ must "explain," in all cases, "how [he or she] considered" both the supportability and consistency factors, as they are "the most important factors."  Id. § 404.1520c(b)(2); see Young, 2021 WL 4148733, at *9 (describing supportability and consistency as "the most important" of the five factors).  As to supportability, "the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase."  Vellone v. Saul, No. 20 Civ. 261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) (citing 20 C.F.R. § 404.1520c(c)(1)), adopted by 2021 WL 2801138 (S.D.N.Y. July 6, 2021). In other words, supportability "looks at how well a medical source supported and explained his/her opinions about the patient."  Herrera v. Comm'r of Soc. Sec., 20 Civ. 7910 (KHP), 2021 WL 4909955, at *6 (S.D.N.Y. Oct. 21, 2021).  Consistency "is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record."  Vellone, 2021 WL 319354, at *6.

---

impairment(s); (ii) The existence and severity of your symptoms; (iii) Statements about whether your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1; (iv) Your residual functional capacity; (v) Whether your impairment(s) meet the duration requirement; and (vi) How failure to follow prescribed treatment (see § 404.1530) and drug addiction and alcoholism (see § 404.1535) relate to your claim.

20 C.F.R. § 404.1513(a)(5).

As to the three remaining factors—relationship with the claimant, specialization, and "other"—the ALJ is required to consider, but need not explicitly discuss, them in determining the persuasiveness of the opinion of a medical source.  20 C.F.R. § 404.1520c(b)(2).  If the ALJ finds two or more medical opinions to be equally supported and consistent with the record, but not identical, the ALJ must articulate how he or she considered those three remaining factors.  See id. § 404.1520c(b)(3).

Thus, "[a]lthough the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he or she] considered the medical opinions' and 'how persuasive [he or she] find[s] all of the medical opinions.'"  Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1)).  "The ALJ need not discuss all of the factors described in the regulations, but must, as to each opinion or prior administrative medical finding, 'explain how [he or she] considered the supportability and consistency factors."  Rivera v. Comm'r of Soc. Sec., No. 19 Civ. 4630 (LJL) (BCM), 2020 WL 8167136, at *14 (quoting 20 C.F.R. § 416.920c(b)(2)).  "If the ALJ fails adequately to 'explain the supportability or consistency factors,' or bases [his] explanation upon a misreading of the record, remand is required."  Id. (quoting Andrew G., 2020 WL 5848776, at *9)).

Several opinions among the district courts within the Second Circuit applying the new regulations have concluded that "the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar" to the former Treating Physician Rule.  Acosta Cuevas v. Comm'r of Soc. Sec., No. 20 Civ. 502 (AJN) (KHP), 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) (surveying district court cases in the Second Circuit

considering the new regulations); see Prieto v. Comm'r of Soc. Sec., No. 20 Civ. 3941 (RWL), 2021 WL 3475625, at *9 (S.D.N.Y. Aug. 6, 2021) (noting that under both the Treating Physician Rule and the new regulations, "an ALJ's failure to properly consider and apply the requisite factors is grounds for remand"); Dany Z. v. Saul, No. 2:19-CV-217 (WKS), 2021 WL 1232641, at *12 (D. Vt. Mar. 31, 2021) (surveying Second Circuit district courts that "have concluded that the factors are very similar to the analysis under the old [Treating Physician] [R]ule"); Andrew G., 2020 WL 5848776, at *5 (noting that "consistency and supportability" were "the foundation of the treating source rule"); see also Brianne S. v. Comm'r of Soc. Sec., No. 19-CV-1718 (FPG), 2021 WL 856909, at *5 (W.D.N.Y. Mar. 8, 2021) (remanding to ALJ with instructions to provide explicit discussion of supportability and consistency of two medical opinions, because ALJ's "mere[] state[ment]" that examining physician's opinion was not consistent with overall medical evidence was insufficient).

### D.  Assessing a Claimant's Subjective Allegations

In considering a claimant's symptoms that allegedly limit his or her ability to work, the ALJ must first determine whether there is an underlying "medically determinable" physical or mental impairment—i.e., an impairments that can be shown by "medically acceptable clinical and laboratory diagnostic techniques"—that "could reasonably be expected to produce [the claimant's] symptoms."  20 C.F.R. § 404.1529(c).  If such an impairment is found, the ALJ must next evaluate the "intensity, persistence, and limiting effects of [the claimant's] symptoms,"  to

determine "the extent to which [those] symptoms, such as pain, affect [the claimant's] capacity to perform basic work activities."  20 C.F.R. § 404.1529(c)(4).

To the extent that the claimant's expressed symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the claimant's credibility.  See Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010).  "An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court."  Rivera v. Berryhill, No. 17 Civ. 991 (JLC), 2018 WL 4328203, at *10 (S.D.N.Y. Sept. 11, 2018).  That deference is due "because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying."  Marquez v. Colvin, No. 12 Civ. 6819 (PKC), 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013).  Thus, a district court will not "second-guess" the ALJ's credibility finding "where the ALJ identified specific record-based reasons for his ruling," Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010), and where the ALJ's credibility finding is supported by substantial evidence.  See Selian v. Astrue, 708 F.3d 409, 420 (2d Cir. 2013) (declining to review ALJ's credibility finding where the ALJ "set forth specific reasons why she found [the plaintiff's] testimony not credible").  If the ALJ rejects the claimant's testimony as not credible, the ALJ must set forth the basis for that finding "with sufficient specificity to permit intelligible plenary review of the record."  Williams, 859 F.2d at 260–61.  The ALJ may not base his credibility determination "on unsupported interpretations of raw medical evidence or mischaracterizations of the record."  Rivera v. Comm'r of Soc. Sec., 2020 WL 8167136, at *20.

Courts have recognized that "the second stage of [the] analysis may itself involve two parts."  Sanchez v. Astrue, No. 07 Civ. 931 (DAB), 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010).  "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of

the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)." Id. "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. § 404.1529(c)(3)]." Id. (citing Gittens v. Astrue, No. 07 Civ. 1397 (GAY), 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)). These seven factors include: (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)–(vii). If the ALJ does not follow these steps, remand is appropriate. Sanchez, 2010 WL 101501, at *15.

## IV.   DISCUSSION

### A.   Evaluation of the Medical Opinion Evidence and RFC Determination

#### 1.   The Parties' Arguments

##### a.   Ms. Vecchio's arguments

Ms. Vecchio argues that the ALJ's determination of her RFC was not supported by substantial evidence because the ALJ failed under the new SSA regulations to properly evaluate the opinion evidence by her treating physician, Dr. Rembert. (ECF No. 18 at 14–22). In stating that Dr. Rembert's opinion "was 'not supported by, or consistent with, the totality of the medical

evidence . . . and the unremarkable mental health treatment records, which show unremarkable mental status evaluations[,]'" Ms. Vecchio argues that "[t]he ALJ only cited one other reason . . . [that she] had a GAF score of 65 in April of 2017."  (Id. at 15) (quoting R. 72).  Ms. Vecchio argues that the ALJ's reliance on a GAF score was improper, because the SSA recognizes—and trains ALJs—that "[w]hile a GAF score may be used as evidence, it is 'inherently of little evidentiary value in [the SSA's] adjudication process.'"  (Id. at 18–19) (quoting 2017 SSA Supplemental ALJ Training                    at                    IV.E.8.E,                    *34, https://www.ssa.gov/foia/resources/proactivedisclosure/2020/2017_Supplemental%20ALJ%20 Training%20Notebook.pdf (last visited Nov. 18, 2021)).  Further, Ms. Vecchio argues that the ALJ incorrectly described her mental status examinations as "unremarkable" when, to the contrary, her "mental status [] worsened at almost every appointment requiring the need for additional or increased medication over a two-year period."  (Id. at 20) (citing R. 261–62, 274–75, 278, 328, 331, 335, 348, 351, 459, 485–86).  She asserts that Dr. Rembert's opinion was supported by, and consistent with, other Record evidence, including Dr. Antiaris' consultative examination, which the ALJ selectively quoted.  (Id. at 19–21).  Ms. Vecchio asserts that, had the ALJ properly evaluated Dr. Rembert's opinion that she had a marked limitation in her ability to maintain attention for two-hour segments, the ALJ would have found her disabled.  (Id. at 21–22) (citing SSR 85-15 & SSR 96-8p).

### b.  **The Commissioner's arguments**

The Commissioner responds that the ALJ properly evaluated Ms. Vecchio's RFC and justifiably relied upon the findings of Drs. Hoffman and Antiaris concerning her limited mental limitations, which were "consistent with the overall record and well-supported by the mental

status findings[.]"  (ECF No. 24 at 21).  The Commissioner notes that the ALJ acknowledged Ms. Vecchio's mental health treatment, including in the emergency room, but concluded, by reference to records of her medical appointments, that her depression and anxiety were reasonably controlled with treatment and medication management.  (Id. at 22–24) (citing 69–70).  Contrary to Ms. Vecchio's assertion that her mental status consistently worsened "at almost every appointment" (ECF No. 18 at 20), the Commissioner argues that the ALJ appropriately determined Dr. Rembert's opinion was not well supported because "her mental status findings were consistent over time reflecting her complaints of anxiety, but also on many occasions, that she had a euthymic or full range affect."  (ECF No. 24 at 26) (citing R. 274–77, 279–82, 332, 335, 337, 339, 341, 343–48, 350–51, 353).  Further, the Commissioner argues that in formulating Ms. Vecchio's RFC, the ALJ properly considered both the medical record, as well as "other medical evidence," including her GAF score.  (Id. at 24–25).

Finally, the Commissioner argues that under the Court's deferential standard of review, the existence of some evidence supporting Ms. Vecchio's claim does not warrant remand.  (ECF No. 24 at 26).

### 2.  Analysis

#### a.  RFC determination & evaluation of opinion evidence

The Court finds that the ALJ correctly applied the new regulations and sufficiently explained how she evaluated the medical opinions she considered, particularly the supportability and consistency factors.

As an initial matter, Ms. Vecchio does not argue—nor could she—that the ALJ failed to obtain or consider any relevant medical opinions.  The Court's review indicates that the ALJ

considered each of the opinions relevant to Ms. Vecchio's psychiatric conditions.  Therefore, this is not a case in which the ALJ failed to develop the record or failed to consider one or more relevant medical opinions in the record.  Cf. Mary D. v. Kijakazi, No. 3:20-cv-656 (RAR), 2021 WL 3910003, at *6–10 (D. Conn. Sept. 1, 2021) (remanding where ALJ failed to obtain additional opinions and clarifications from claimant's treating physicians to fill gaps in the record); Prieto, 2021 WL 3475625, at *15 (remanding where ALJ erred in failing to obtain medical source opinions from certain of claimant's treating physicians).

Ms. Vecchio's argument is premised on the ALJ's supposed failure to appreciate the requirements of the new regulations, which supplant the former Treating Physician Rule, in considering Dr. Rembert's opinion.  (See § III.C supra).  Accordingly, the Court reviews the ALJ's Decision to assess whether she explained her approach as to the supportability and consistency factors, and concludes that she adequately did so as to each of the relevant medical opinions.

First, the ALJ's analysis of the supportability and consistency of Dr. Rembert's opinion was adequate.  After summarizing for nearly five pages Ms. Vecchio's treatment notes, mental status examinations, evaluations, subjective complaints, and opinion evidence (R. 67–71), the ALJ concluded that Dr. Rembert's opinion was not persuasive, because her "extreme limitations are not supported by or consistent with, the totality of the medical evidence of record and the unremarkable mental health treatment records, which show unremarkable mental status examinations."  (R. 72) (emphasis added).

Among these limitations Dr. Rembert noted were marked limitations in cooperating and handling conflict with others, recognizing a mistake and correcting it, maintaining attention for a two-hour segment, ignoring or avoiding distractions while working, managing psychologically-

based symptoms, and responding appropriately to changes in a routine work setting.  (R. 382–84; see R. 71–72).  The ALJ examined treatment records from Carmel Psych Associates, where Drs. Rembert and Mouzon managed Ms. Vecchio's psychiatric care (R. 381), however, and found that those records reflected unremarkable objective clinical findings and mental status examinations. (R. 69).  The mental status evaluations the ALJ cited were those occurring on January 10, 2018, when, although Ms. Vecchio reported being "down, irritable, anxious," a mental status exam "noted good eye contact, well groomed, normal psychomotor activity, euthymic affect, normal rate of speech, good judgment, good insight, fair impulse control, and goal-directed thought processes but preoccupied thought content"; June 5, 2018, when, despite a report Ms. Vecchio was not doing well, "her mental status examination was unremarkable"; and March 27, 2019, when despite feeling "up and down [with] anxiety and depression" a mental status exam "indicated good eye contact, well groomed, normal psychomotor activity, euthymic affect, normal rate of speech, fair judgment, good insight, fair impulse control, and goal-directed thought processes." (R. 69 (citing R. 328, 341, 348)).  Reviewing her treatment notes, the ALJ concluded that "her symptoms wax and wane, and her medication has been adjusted." (R. 69 (citing R. 328, 389)).  Accordingly, the ALJ appropriately concluded Dr. Rembert's asserted limitations were not supported by the objective medical evidence.  See Aguirre v. Saul, No. 20 Civ. 4648 (GWG), 2021 WL 4927672, at *7 (S.D.N.Y. Oct. 22, 2021) (citing 20 C.F.R. § 416.920c(c)(1) and finding that ALJ "properly concluded" that treating physician's medical opinion "lacked support" from his own treatment notes and was inconsistent with other medical evidence and claimant's hearing testimony); 20 C.F.R. § 404.1520c(c)(1) ("[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to

support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be."); cf. Knief v. Comm'r of Soc. Sec., No. 20 Civ. 6242 (PED), 2021 WL 5449728, at *1–2, 8–9 (S.D.N.Y. Nov. 22, 2021) (affirming ALJ decision which concluded, after evaluating treatment records and mental status examinations that claimant had "meaningful, but not profound, mental restrictions" with chronic anxiety and mood disturbances, treated with regular psychiatric appointments and psychiatric medications).

The arguments in Ms. Vecchio's Motion fall short. First, the ALJ Decision considered appropriate medical and nonmedical evidence. In evaluating Ms. Vecchio's RFC, the ALJ appropriately considered records of her medical treatment as well as other medical records, such as her GAF score, and her subjective complaints. (See R. 68–72). See 20 C.F.R. §§ 404.1513(a) (listing the categories of evidence as "objective medical evidence"; "medical opinion[s]"; "other medical evidence"; evidence from nonmedical sources; and "prior administrative medical finding[s]"); see also 20 C.F.R. § 404.1520c(d) (stating that the ALJ is "not required to articulate how [he or she] considered evidence from nonmedical sources" in the same manner as medical opinions and prior administrative medical findings). Although Ms. Vecchio is correct that a GAF score is of limited value, see Price v. Comm'r of Soc. Sec., No. 19 Civ. 8499 (JPO), 2021 WL 1222139 at *4 (S.D.N.Y. Mar. 31, 2021), her assertion that "using a GAF score as support for the ALJ's findings is inappropriate[]" (ECF No. 18 at 18) is incorrect. See Gomez v. Saul, No. 19 Civ. 9278 (PMH) (JCM), 2020 WL 8620075, at * 28 n.19 (S.D.N.Y. Dec. 23, 2020) (noting that "it is not erroneous for an ALJ to rely on a GAF score where he or she also relies on evidence from other treatment records to support the weight assigned to the treating physician's opinion."). As described supra, the GAF score was not the "one reason" the ALJ found Dr. Rembert's opinion

not persuasive, as Ms. Vecchio argues.  (ECF No. 18 at 18).  To the contrary, the ALJ found Dr. Rembert's opinion not persuasive because it was not supported by or consistent with her unremarkable mental status examinations—several of which she specifically cited in the Decision—as well as Ms. Vecchio's GAF score.  (R. 72).

The Court notes as well that in determining the RFC the ALJ properly considered Ms. Vecchio's regular daily activities.  See Cepeda v. Comm'r of Soc. Sec., No. 19 Civ. 4936 (BMC), 2020 WL 6895256, at *3–4 (S.D.N.Y. Nov. 24, 2020).  The ALJ noted — correctly, in the Court's view — that Ms. Vecchio's statements and actions, including continuing to work part-time after her alleged onset date of disability, socializing with friends, attending church and selling items on eBay, undermined her allegations of "disabling impairments."  (R. 70).

Second, the ALJ Decision was not conclusory and devoid of analysis, as Ms. Vecchio suggests, and relatedly, the Court finds that the ALJ did not selectively cite or "cherry-pick" only favorable evidence to include in the Decision.  Having reviewed the Record, the Court finds ALJ Decision fairly described Ms. Vecchio's psychiatric impairments, and acknowledged her post traumatic stress, symptoms including flashbacks and nightmares, and emergency treatment for a panic attack.  (R. 68–69).  That the ALJ deemed only a portion of Dr. Antiaris's medical opinion to be persuasive likewise was not an act of impermissible cherry-picking, as Ms. Vecchio alleges (ECF No. 18 at 19–20), because the ALJ explained that a portion of her opinion was "unpersuasive because it is inconsistent with the totality of the medical evidence of record, including the unremarkable mental status examinations."  (R. 71); see Veino, 312 F.3d at 587–88 (holding that it was the ALJ's prerogative to resolve conflicts in the evidence by crediting only a portion of a doctor's testimony); Herrera, 2021 WL 4909955, at *9–10 (rejecting as "without merit" the claim

of cherry-picking, where the ALJ "grappled with inconsistent records" and in one instance found an opinion "to be only somewhat persuasive").

Ms. Vecchio's related argument, citing <u>Drake v. Saul</u>, 839 F. App'x 584 (2d Cir. 2020), that the ALJ Decision, and particularly its evaluation of the opinion evidence, was impermissibly conclusory (ECF No. 18 at 15–16), is not borne out by the ALJ Decision's thorough evaluation of the evidence.  (<u>See</u> R. 68–72).  The ALJ's analysis here was unlike the analysis in <u>Drake</u>, which the Second Circuit understandably found to be "cursory" and "inadequate" when it discounted opinion evidence as "'not supported by the evidence,' without any further explanation."  839 F. App'x at 586–87.

As set forth above, this Court's review of the ALJ Decision "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  <u>Selian</u>, 708 F.3d at 417.  Under this substantial evidence standard, "once an ALJ finds facts, [the court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'"  <u>Herrera</u>, 2021 WL 4909955, at *9–10 (quoting <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam)) (holding that substantial evidence supported the ALJ's RFC assessment where the ALJ "grappled with inconsistent records," noted and discussed conflicting evidence, including objective tests, the claimant's statements, "and arrived at a decision based on the record as a whole.").

Here, the ALJ's Decision <u>was</u> based on the correct legal standard, that is, 20 C.F.R. § 404.1520c(a)–(c)(5).  The ALJ based her RFC determination on the medical record, Ms. Vecchio's subjective complaints and testimony, her mental health treatment history, and fairly robust daily activities, as well as the medical opinion evidence, and incorporated the key portions of this

evidence into the RFC.  (See R. 68–72).   Although there may be some evidence in the record that would support a contrary RFC determination, it is not for this Court to "reweigh th[e] evidence or substitute its judgment for that of the ALJ where," as here, "the evidence is susceptible of more than [one] interpretation."  Rivera v. Comm'r of Soc. Sec., 368 F. Supp. 3d 626, 642 (S.D.N.Y. 2019).   Rather, "once an ALJ finds facts, [the Court] can reject those facts only if a reasonable factfinder would have to conclude otherwise."  Brault, 683 F.3d at 448(internal citation omitted). Accordingly, "this Court cannot say that no reasonable factfinder could have reached the ALJ's conclusions about [the plaintiff's] RFC . . . . Thus, this Court must affirm the findings."  Herrera, 2021 WL 4909955, at *11 (citing Brault, 683 F.3d at 448; Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991)).   The Court therefore finds that the RFC is supported by substantial evidence and consistent with the Record.  See Cepeda, 2020 WL 6895256, at *12 (affirming RFC determination concerning claimant's major depressive disorder and anxiety after the ALJ considered claimant's statements about his symptoms, treatment history—including mental status exams, daily activities, and medical source statements, among other evidence).

## V.   CONCLUSION

For the reasons set forth above, I respectfully recommend that Ms. Vecchio's Motion be DENIED and the Commissioner's Motion be GRANTED.

Dated:       New York, New York
             December 1, 2021

_____
SARAH L. CAVE
United States Magistrate Judge

*                         *                         *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Vyskocil.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).